[Cite as *Contreraz v. Bettsville*, 2011-Ohio-4178.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

ROSALINDA CONTRERAZ,
INDIVIDUALLY AND AS
ADMINISTRATRIX OF THE
ESTATE OF SANTOS LEON                 CASE NO. 13-10-48
GARCIA, DECEASED,

    PLAINTIFF-APPELLANT,

    v.

                                    O P I N I O N

VILLAGE OF BETTSVILLE, ET AL.,

    DEFENDANTS-APPELLEES.

Appeal from Seneca County Common Pleas Court
Trial Court No. 08CV0594

Judgment Affirmed

Date of Decision: August 22, 2011

APPEARANCES:

    *R. Ethan Davis* for appellant.

    *John T. McLandrich* and *Frank H. Scialdone,* for appellees.

**PRESTON, J.**

{¶1} Plaintiff-appellant, Rosalinda Contreraz, Individually and as Administratrix of the Estate of Santos Leon Garcia, deceased, appeals from the judgment of the Seneca County Court of Common Pleas, which granted defendants-appellees', Village of Bettsville, Bettsville Recreation Board, and Andrea Bender, motion for summary judgment. For the reasons that follow, we affirm.

{¶2} This case involves the tragic death of Santos Garcia (hereinafter "Garcia"), who drowned at the Village of Bettsville's public swimming area. The case arises out of the following set of facts.

{¶3} The Village of Bettsville owns the Eells Park Quarry, a public recreational swimming area, which is operated by the Bettsville Recreation Board. At the time of the incident, the general layout of the quarry, which is not in dispute, was as follows. Located near the quarry beach there was a small single story building, which was used as a concession stand, park pool director's office, the lifeguard locker/break room, and an equipment storage area. Inside the concession building there was a land line telephone to be used for emergencies. With regards to the beach, there were two elevated lifeguard stands located on the beach, while an additional elevated lifeguard stand was positioned by the diving

board and slide platform. There were two floating rafts located in the deeper end of the quarry, and between the two floating rafts was an aquatic toy called an "aqua bobber."

{¶4} Additionally, there was a floating buoy line that traversed across the quarry for purposes of separating the shallow end from the deep end. The buoy line was positioned at a water depth between four feet (4') to five feet (5'). In addition, there was another buoy line, made up of old railroad ties, located just beyond the two floating rafts and used for purposes of separating the swim area from the non-swim area.

{¶5} In 2006, the Bettsville Recreation Board hired Andrea Bender (hereinafter "Bender") as a lifeguard. (A. Bender Depo. at 7-8). Bender worked at the park during the summers of 2006, 2007, and 2008, and had been the on-duty lifeguard on the beach when Garcia drowned. (Id.).

{¶6} The incident occurred on August 3, 2007. Garcia and his sisters, Rosalinda and Eva, along with several of Garcia's friends and Garcia's aunt and uncle, decided to go swimming at the quarry. (A. Alonso Depo. at 21-22); (R. Garcia Depo. at 18-19). At the time of the incident, Garcia was fifteen-years-old and five feet three inches (5'3") in height. (Coroner's Report, Ex. K). In addition, Garcia had taken a YMCA swim course and was described as an average swimmer who either could not or did not like to swim underwater. (R. Garcia Depo. at 15);

(E. Garcia Depo. at 18-20). The group arrived at the quarry sometime in the late afternoon.

{¶7} Before entering the water, Garcia's friend, Lamont, said that he provided Garcia with shoelaces so that Garcia could tie his long pants up around his knees to swim. (L. Garcia Depo. at 28-29). Rosalinda and Eva were the first ones to enter the water. (E. Garcia Depo. at 35). Eva said she swam out to the aqua bobber, while Rosalinda swam out to the deep-end and was treading water near the diving boards and slide platform. (E. Garcia Depo. at 35); (R. Garcia Depo at 35-36). Eva said that she saw Garcia and several of his friends enter the water from the shallow end and walk out towards the outer raft closest to the diving boards, where Rosalinda was located. (E. Garcia Depo. at 36). Lamont said that he and Garcia then swam under the buoy line into the deeper portion of the swimming area. (L. Garcia Depo. at 36). At this point, Rosalinda said that she had still been treading water near the diving board and slide platform when Garcia proceeded to swim underwater and tickle her feet. (R. Garcia Depo. at 37). Rosalinda said that after this occurred, she and Garcia decided to race out to the closest raft. (R. Garcia Depo. at 37). Rosalinda said that she made it to the raft in what she believed was a few seconds but when she turned around, she did not see Garcia. (Id. at 39). Eva, who was still on the aqua bobber, said that she had had her back to the swimming area, but that when she turned around she also did not

see Garcia in the water. (E. Garcia Depo. at 37-38). It was at this point in time when Rosalinda said that she began to yell for help, stating that her brother was missing. (R. Garcia Depo. at 43). Overall, Rosalinda said that it was approximately thirty to forty seconds from the time she got to the raft until a swimmer surfaced with Garcia. (Id. at 47).

{¶8} Another swimmer at the quarry, Alex Fox, who had been swimming near the buoy line with his girlfriend, testified that he heard Rosalinda yelling that she could not find her brother. (Fox Depo. at 32-33). Alex said that his girlfriend was asking the lifeguard to take action; however, Alex admitted that at no point was it apparent whether the missing individual was missing in the water or missing out of the water. (Id. at 27, 32-33). In fact, Alex was under the belief that the missing individual was out of the water near the concession building. (Id.).

{¶9} Nevertheless, Alex said that he decided to swim under water and swim towards the diving board and slide platform in the deep end of the quarry. (Id. at 43-44, 56, 94). After approximately ten to fifteen feet, Alex said he saw Garcia some distance in front of the diving board at the bottom of the quarry. (Id. at 32-33, 43-44, 94). Alex said that he picked Garcia off the bottom of the quarry and brought him to the surface. (Id.). When he got to the surface, Alex said that he saw the lifeguard jump down from the lifeguard stand and run towards the concession building. (Id.). At that point, Alex said that he, with the help of two

other male swimmers, brought Garcia to shore. (Id.). One of the two other male swimmers, Jacob Pfotenhauer, corroborated Alex's version of events. (Pfotenhauer Depo. at 31, 39-40, 45-46).

{¶10} Overall, none of the witnesses saw Garcia in any type of distress nor did they see Garcia submerged below the surface of the water.

{¶11} Michael Abernathy testified that he had been the on-duty lifeguard prior to the incident and that he remembered Garcia and his friends enter the shallow area of the quarry. (Abernathy Depo. at 18). However, he said that he never saw Garcia go beyond the buoy line and into the deep end of the quarry. (Id.).

{¶12} Andrea Bender testified that she took over for Michael at 7:00 p.m. and became the on-duty lifeguard. (A. Bender Depo. at 46). She said that she did an initial head count of swimmers and determined that there were 15 to 20 swimmers in the water. (Id. at 48). Bender testified that approximately thirty seconds to one minute after she had taken the lifeguard stand, a woman approached her and told her that a boy was missing. (Id. 49-50). Bender said that she attempted to get more information from the woman and asked her where the boy was missing. (Id. at 52). After about one minute and thirty seconds of discussion, Bender stated that the woman told her that she believed the missing boy had been in the water and that she did not think that the boy knew how to

-6-

swim. (Id.). Bender said that because she was unaware of the missing boy's location, she blew her whistle to get assistance from her pool director, Rachel Banks, who was located in the concession building. (Id.).

{¶13} Bender went on to state that approximately ten to fifteen seconds after she blew her whistle, she heard a rise in voices and saw a swimmer surface with Garcia. (Id. at 56). Bender said that she then jumped down from the lifeguard stand, blew her whistle to clear everyone from the water, and sprinted to the concession building, yelling for Rachel Banks to call 911. (Id. at 56, 64). Bender explained that as she approached the concession building, lifeguard Michael Abernathy ran down the beach towards the water. (Id. at 66). Bender testified that she told Rachel Banks of the emergency and to call 911. (Id. at 69).

{¶14} Michael Abernathy and another swimmer began C.P.R. on Garcia after he was brought on to the beach. (Abernathy Depo. at 30). They continued to provide C.P.R. until paramedics arrived, at which time a paramedic assisted Michael Abernathy with C.P.R. (Id. at 35). Garcia was eventually transported to a nearby hospital; however, all efforts to save Garcia were unsuccessful.

{¶15} On November 19, 2008, Rosalinda Contreraz, Individually and as Administratrix of the Estate of Garcia (hereinafter "the Estate" or "Mother"), filed a complaint against the Village of Bettsville, Bettsville Recreation Board, and

Lifeguard Andrea Bender.[1]  In her complaint, Mother alleged that Garcia's death was proximately caused by the Village and Bender's negligence.  In particular, Mother alleged the following six causes of action: wrongful death, premises liability, physical defect, survival claim, loss of consortium, and vicarious liability.

{¶16} On June 28, 2010, the defendants filed a motion for summary judgment, and on October 12, 2010, they were granted leave to file a supplemental motion for summary judgment instanter with exhibits attached.  On October 18, 2010, Mother filed a memorandum in opposition to the defendants' motion for summary judgment.  The defendants filed a response memorandum on October 28, 2010.

{¶17} Thereafter, on December 6, 2010, the trial court issued its order and decision granting the defendants' motion for summary judgment.

{¶18} Mother now appeals and raises the following four assignments of error.  For ease of our discussion, we elect to address Mother's first and second assignments of error together.

**ASSIGNMENT OF ERROR NO. I**

**THE TRIAL COURT ERRED AS A MATTER OF LAW IN GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND FINDING THAT THE REVISED CODE §2744.02(B)(4) EXCEPTION TO IMMUNITY DID NOT APPLY IN THIS CASE.**

---

[1] The Village of Bettsville and the Recreation Board will be referred to collectively as "the Village."

## ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ERRED AS A MATTER OF LAW IN GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND FINDING THAT THERE WAS NO EVIDENCE OF NEGLIGENCE OR A DEFECT IN THE PREMISES.**

{¶19} In her first and second assignments of error, Mother argues that the trial court erred in finding that the Village was immune from liability under R.C. 2744.02(A)(1). In particular, Mother argues that the exception for immunity pursuant to R.C. 2744.02(B)(4) was applicable, but that the trial court erred in finding that, because there was no evidence of negligence and that there was no evidence of any physical defects on the premises, the exception to immunity did not apply.

### Standard of Review

{¶20} We review a decision to grant summary judgment de novo. *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 390, 738 N.E.2d 1243. Under this standard of review, we review the appeal independently, without any deference to the trial court. *Conley-Slowinski v. Superior Spinning & Stamping Co.* (1998), 128 Ohio App.3d 360, 363, 714 N.E.2d 991. A motion for summary judgment will be granted only when the requirements of Civ.R. 56(C) are met. Thus, the moving party must show: (1) that there is no genuine issue of material fact, (2) that the

moving party is entitled to judgment as a matter of law, and (3) that reasonable minds can reach but one conclusion when viewing the evidence in favor of the non-moving party, and the conclusion is adverse to the non-moving party. Civ.R. 56(C); *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.* (1994), 69 Ohio St.3d 217, 219, 631 N.E.2d 150.

{¶21} The party asking for summary judgment bears the initial burden of identifying the basis for its motion in order to allow the opposing party a "meaningful opportunity to respond." *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 116, 526 N.E.2d 798. The moving party must also demonstrate the absence of a genuine issue of material fact as to an essential element of the case. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292, 662 N.E.2d 264. Then the moving party must demonstrate that they are entitled to summary judgment as a matter of law, at which time, the burden then shifts to the non-moving party to produce evidence on any issue which that party bears the burden of production at trial. *Deutsche Bank Trust Co. v. McCafferty*, 3d Dist. No. 1-07-26, 2008-Ohio-520, ¶9, citing Civ.R. 56(E).

### Ohio's Political Subdivision Tort Liability Act

{¶22} Under Ohio's Political Subdivision Tort Liability Act, codified under R.C. Chapter 2744, it is well-established that a reviewing court must engage in a three-tiered analysis to determine whether a political subdivision is entitled to

immunity from civil liability. *Hubbard v. Canton Cty. Sch. Bd. of Edn.*, 97 Ohio St.3d 451, 2002-Ohio-6718, 780 N.E.2d 543, ¶10, citing *Cater v. Cleveland* (1998), 83 Ohio St.3d 24, 28, 697 N.E.2d 610. See, also, *Elston v. Howland Local Schools*, 113 Ohio St.3d 314, 2007-Ohio-2070, 865 N.E.2d 845, ¶10. The first tier of the analysis is to determine whether the entity claiming immunity is a political subdivision and whether the harm occurred in connection with a governmental or proprietary function. R.C. 2744.02(A)(1); *Hubbard* at ¶10. Generally, political subdivisions are not liable for damages in civil actions for the "injury, death, or loss to a person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." R.C. 2744.02(A)(1).

{¶23} However, the immunity established under R.C. 2744.02(A)(1) is not absolute; and the subdivision's immunity is subject to a list of exceptions under R.C. 2744.02(B)(1)-(5). Once general immunity has been established by the political subdivision, the burden lies with the plaintiff to show that one of the five exceptions under R.C. 2744.02(B) apply. *Brady v. Bucyrus Police Dept.*, 3d Dist. No. 3-10-21, 2011-Ohio-2460, ¶47, citing *Maggio v. Warren*, 11th Dist. No. 2006-T-0028, 2006-Ohio-6880, ¶38. Thus, if the entity is a political subdivision entitled to immunity under the first tier of the analysis, then the court must go to the second tier of the analysis and determine whether any of the exceptions to liability

enumerated in R.C. 2744.02(B) apply. *Hubbard* at ¶12, citing *Cater*, 83 Ohio St.3d at 28. If any of the exceptions to immunity are found to be applicable, then the political subdivision will lose its immunity. If this occurs, then the court must move on to the third tier of the analysis, where it must determine whether the political subdivision's immunity can be reinstated as long as the political subdivision proves one of the defenses to liability under R.C. 2744.03.

{¶24} Here, no one disputes the fact that the Village of Bettsville and Bettsville Recreation Board are political subdivisions and were engaged in the governmental function of maintenance and operation of a recreational swimming area. See R.C. 2744.01(C)(2)(u)(iv). As such, they are, presumptively immune from liability under R.C. 2744.02(A)(1) and are entitled to immunity unless one of the exceptions in R.C. 2744.02(B) applies.

{¶25} Under the second tier of the immunity analysis, we note that a political subdivision's immunity is typically subject to the five exceptions listed in R.C. 2744.02(B)(1)-(5). On appeal, the parties' arguments center around only one of the five exceptions, R.C. 2744.02(B)(4), thus, our discussion will be limited to R.C. 2744.02(B)(4)'s application. However, before we can analyze the merits of the R.C. 2744.02(B)(4) exception, we must address two initial arguments presented by the parties.

### *Cater v. Cleveland*

{¶26} The first initial argument raised on appeal concerns whether R.C. 2744.02(B)(4) should even apply given the Ohio Supreme Court's decision in *Cater v. Cleveland* (1998), 83 Ohio St.3d 24, 28, 697 N.E.2d 610.

{¶27} The Village claims that, pursuant to the Supreme Court's decision in *Cater*, R.C. 2744.02(B)(4) is inapplicable to recreational swimming areas. As such, the Village argues that, because R.C. 2744.02(B)(4) does not apply to recreational swimming areas, they are presumptively entitled to immunity under R.C. 2774.02(A)(1). In response, Mother claims that, in light of the Ohio Supreme Court's recent decisions, it's holding in *Cater* is no longer binding. Mother also points to a recent decision by this Court where she claims that we declined to follow the Ohio Supreme Court's rationale in *Cater*. See *Thomas v. Bagley*, 3d Dist. No. 11-04-12, 2005-Ohio-1921.

{¶28} In *Cater*, the Ohio Supreme Court was asked to consider whether R.C. 2744.02(B)(4) applied to an indoor municipal swimming pool. *Cater*, 83 Ohio St.3d at 27-28. Ultimately, the Court concluded that the exception did not apply to indoor municipal swimming pools, and reasoned as follows:

> **Although former R.C. 2744.02(B)(4) may be applicable to other governmental functions, not specifically listed in the statute, we believe that it does not apply to an indoor swimming pool. (See, also, Mattox v. Bradner [Mar. 21, 1997], Wood App. No. WD-96-038, unreported, 1997 WL 133330, which held that the**

> **exception enumerated in R.C. 2744.02[B][4] is inapplicable to injuries sustained in a municipal swimming pool.) Unlike a courthouse or office building where government business is conducted, a city recreation center houses recreational activities. Furthermore, if we applied former R.C. 2744.02(B)(4) to an indoor swimming pool, liability could be imposed upon the political subdivision. However, there would be no liability if the injury occurred at an outdoor municipal swimming pool, since the injury did not occur in a building. We do not believe that the General Assembly intended to insulate political subdivisions from liability based on this distinction. Therefore, we reject appellants' contention that former R.C. 2744.02(B)(4) applies to an indoor municipal swimming pool.**

*Cater*, 83 Ohio St.3d at 31-32.

{¶29} There has been at least one other appellate district that has recently applied *Cater* to outdoor swimming facilities and has held that the physical-defect exception does not apply, even if the injury was proximately caused by the negligence of an employee and due to a physical defect.[2] *O'Connor v. City of Fremont*, 6th Dist. No. S-10-008, 2010-Ohio-4159. However, we acknowledge that this Court has also recently addressed the Supreme Court's decision in *Cater*, but unlike the other appellate district, we questioned the validity of *Cater*, especially in light of the Supreme Court's more recent ruling in *Hubbard*. See *Thomas*, 2005-Ohio-1921. In *Thomas*, this Court noted:

---

[2] We note that the Court of Appeals for the Ninth District recently released an opinion on August 3, 2011, which overruled one of its prior decisions that had applied *Cater* to outdoor swimming facilities. *Hawsman v. Cuyahoga Falls*, 9th Dist. No. 25582, 2011-Ohio-3795, overruling *Hopper v. Elyria*, 182 Ohio App.3d 521, 2009-Ohio-2517, 913 N.E.2d 997, not accepted for review, *Hopper v. Elyria*, 123 Ohio St.3d 1424, 2009-Ohio-5340, 914 N.E.2d 1064.

-14-

> **Initially, we note that this Court has serious doubts regarding the continuing validity of *Cater* in light of the Supreme Court's more recent ruling in *Hubbard*. In *Cater* the Supreme Court found that municipal swimming pools were not subject to the R.C. 2744.02(B)(4) exception based on the fact that the governmental function being performed by municipal pools was recreational in nature and not the kind of "government business" being conducted in a courthouse or government office building. Id. at 31-32, 697 N.E.2d 610. The Court made this finding despite having recognized earlier in the same opinion that "the General Assembly has already classified the operation of a municipal swimming pool as a governmental function under R.C. 2744.01(C)(2)(u)." Id at 28, 697 N.E.2d 610. No such distinction has been made by the Court since *Cater*. In fact, in *Hubbard* the Court stressed that the only relevant inquiry in such a case is whether "the injuries claimed by plaintiffs were caused by negligence occurring on the grounds of a building used in connection with a government function * * *." *Hubbard* at ¶ 18. There was no discussion regarding whether the governmental function in the building involved was recreational in nature.**

> **Additionally, as noted by Justice Moyer in a concurring opinion in *Cater,* outdoor pools are located on the grounds of buildings such as shelters, restrooms and storage areas that are being used in the performance of a governmental function. *Cater*, 83 Ohio St.3d at 35, 697 N.E.2d 610. Therefore, both outdoor and indoor municipal pools would be subject to the R.C. 2744.02(B)(4) exception, and the distinction relied on by the majority in *Cater* involving outdoor and indoor municipal pools would appear to be invalid.**

*Thomas*, 2005-Ohio-1921, ¶¶34-35.

{¶30} While we acknowledge this Court's prior decision in *Thomas*, we ultimately find that the trial court did not err in granting the Village's motion for summary judgment because Mother failed to present sufficient evidence that a

physical defect on the premise caused Garcia's death. We will discuss this in further detail below; however, before we can discuss the merits of the physical defect arguments raised on appeal, we must next address Mother's argument that R.C. 2744.02(B)(4) is unconstitutional and that the physical-defect requirement should not apply.

## Constitutionality of R.C. 2744.02(B)(4)

{¶31} Mother briefly argues in her appellate brief that she was not required to present evidence of a physical defect in the premises pursuant to the Ohio Supreme Court's ruling in *Hubbard v. Canton City School Bd. of Edn.* (2002), 97 Ohio St.3d 451, 2002-Ohio-6718, 780 N.E.2d 543. She also claims that she did not have to prove the physical-defect requirement because the legislation that amended that particular statutory provision was declared unconstitutional.

{¶32} In *Hubbard*, in interpreting the previous version of R.C. 2744.02(B)(4), the Ohio Supreme Court held that:

> **R.C. 2744.02(B)(4) applies to all cases where an injury resulting from the negligence of an employee of a political subdivision occurs within or on the grounds of buildings that are used in connection with the performance of a governmental function. The exception is not confined to injury resulting from physical defects or negligent use of grounds or buildings.**

*Hubbard*, at the syllabus. It is this holding that Mother relies on in support of her position that there was no need to prove that there was a physical defect in the premises.

{¶33} However, we find that Mother's reliance on *Hubbard* is misplaced. In *Hubbard*, the Ohio Supreme Court interpreted the *prior* version of R.C. 2744.02(B)(4), effective July 6, 2001. See *Hubbard*, 2002-Ohio-6718, at ¶¶15-18. Because the statute in effect at the time did not contain any explicit language concerning a "physical defect," the Supreme Court refused to interpret the statute as having such a requirement, even though it acknowledged the legislature's prior, consistent, but ultimately failed attempts to change the statutory language in R.C. 2744.02(B)(4) to include such a requirement. Id. at ¶¶16-18. Nevertheless, in 2003, the Ohio General Assembly amended R.C. 2744.02(B)(4) and explicitly added the language "and is due to physical defects within or on the grounds." This is the current version of the statute. Because the current version of the statute clearly contains the additional "physical defect" language, it has essentially invalidated the analysis rendered in *Hubbard*. Moreover, the amendment to the statute became effective on April 9, 2003, and contrary to Mother's argument, has not been declared unconstitutional by the Ohio Supreme Court. Since that time, appellate courts have generally limited the R.C. 2744.02(B)(4) exception to injuries that were "due to physical defects." *DeMartino v. Poland Local School*

-17-

*Dist.*, 7th Dist. No. 10 MA 19, 2011-Ohio-1466, ¶40; *Troutman v. Jonathon Alder Local School Dist. Bd. of Edn.*, 12th Dist. No. CA2009-08-016, 2010-Ohio-855, ¶24; *Yeater v. LaBrae School Dist. Bd. of Edn.*, 11th Dist. No. 2009-T-0107, 2010-Ohio-3684, ¶14, citing *Dunfee v. Oberlin School Dist.*, 9th Dist. No. 08CA009497, 2009-Ohio-3406, ¶13; *Dynowski v. Solon*, 8th Dist. No. 92264, 2009-Ohio-3297, ¶19; *Hopkins v. Columbus Bd. of Educ.*, 10th Dist. No. 07AP-700, 2008-Ohio-1515, ¶18. But see, *Grine v. Sylvania Schools Bd. of Edn.*, 6th Dist. No. L-06-1314, 2008-Ohio-1562, ¶56 (finding that the Ohio Supreme Court had interpreted the prior version of R.C. 2744.02(B)(4), effective July 6, 2001, but concluding that the Ohio Supreme Court has declared new amendment unconstitutional).

**{¶34}** Furthermore, with respect to Mother's argument that the legislation that amended the R.C. 2744.02(B)(4) exception has been declared unconstitutional, as we mentioned above, the Ohio Supreme Court has not declared the current version of R.C. 2744.02(B)(4), effective on April 9, 2003, to be unconstitutional. In fact, the Court has recently analyzed the physical defect requirement with respect to the absence of a required smoke detector. See *Moore v. Lorain Metro. Hous. Auth.*, 121 Ohio St.3d 455, 2009-Ohio-1250, 905 N.E.2d 606, ¶¶22-25 (reversing and remanding the case to the trial court because the trial court had failed to consider whether the absence of a required smoke detector on property owned by a political subdivision constituted a physical defect pursuant to

R.C. 2744.02(B)(4)).  See, also, *Hamrick v. Bryan City School Dist.*, 6th Dist. No. WM-10-014, 2011-Ohio-2572, ¶22 (rejecting the appellant's argument that R.C. 2744.02(B)(4) has been declared unconstitutional by the Ohio Supreme Court).

**{¶35}** More significantly, we note that Mother failed to raise this issue below at the trial court.  "In order for a party to challenge the constitutionality of a state statute, 'the issue must be raised in the complaint or the initial pleading and the Ohio Attorney General must be properly served.'"  *Troutman*, 2010-Ohio-855, at ¶12, quoting *M.B. v. Elyria City Bd. of Edn.*, 9th Dist. No. 05CA008831, 2006-Ohio-4533, ¶6.  As such, we find that Mother has waived the issue for purposes of appeal.  See *State v. Heft*, 3d Dist. No. 8-09-08, 2009-Ohio-5908, ¶29, quoting *State v. Rice*, 3d Dist. Nos. 1-02-15, 1-02-29, 1-02-30, 2002-Ohio-3951, ¶7, quoting *State v. Awan* (1986), 22 Ohio St.3d 120, 489 N.E.2d 277, syllabus, limited by *In re M.D.* (1988), 38 Ohio St.3d 149, 527 N.E.2d 286, syllabus.

**{¶36}** Now that we have addressed all of the parties' initial arguments, we will discuss the applicability of the R.C. 2744.02(B)(4) exception as it relates to the facts and circumstances of this particular case.

### R.C. 2744.02(B)(4)

**{¶37}** As we stated above, once general immunity has been established by the political subdivision, the burden lies with the plaintiff to show that one of the five exceptions under R.C. 2744.02(B) apply.  *Brady*, 2011-Ohio-2460, at ¶47,

citing *Maggio*, 2006-Ohio-6880, at ¶38. Here, the only exception that is being argued before us concerns the application of R.C. 2744.02(B)(4). R.C. 2744.02(B)(4) provides:

> **[s]ubdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and courthouses * * *.**

Under the terms of R.C. 2744.02(B)(4), the Village's presumptive immunity should have been abrogated only if Mother demonstrated that the injury was: (1) caused by employee negligence, (2) on the grounds or in buildings used in connection with the performance of a governmental function, and (3) due to physical defects on or within those grounds or buildings.

{¶38} Here, after considering all of the evidence, the trial court found as follows:

> **In addition, the R.C. 2744.02(B)(4) exception is inapplicable because the injury was not due to a "physical defect." Although the Complaint alleges that Garcia became submerged below the water due to a sudden drop-off, absent is any evidence supporting this allegation. There is no evidence that a sudden drop-off existed and there is no evidence that the drowning could have been caused by an increase in water depth. In short, the evidence establishes that Garcia was swimming just prior to the incident and the relevant areas of the park quarry had only a very gradual water depth increase. For this additional reason, the R.C. 2744.02(B)(4) exception does not apply.**

> **There is also no evidence of any underwater obstruction present at the time of the incident, which could represent a "physical defect" that caused the drowning. The testimony of Alex Fox establishes that Garcia was not entangled or trapped by an underwater obstruction. There was also no evidence of trauma to Garcia's body.**
>
> **Because none of the immunity exceptions under R.C. 2744.02(B)(1)-(5) apply, the Village of Bettsville and Bettsville Recreation Board are entitled to immunity under R.C. 2744.02(A)(1).**

(Dec. 6, 2010 JE at 15-16).

{¶39} On appeal, in attempting to establish the exception under R.C. 2744.02(B)(4), Mother claims that the trial court erred in failing to consider evidence of the following seven violations committed by the Village: (1) that the Village was negligent per se and/or reckless by failing to have the required number of lifeguards; (2) that the Village failed to appropriately train and evaluate their lifeguard staff; (3) that the Village was negligent and/or reckless in their hiring and training of lifeguard Andrea Bender; (4) that Andrea Bender fell below the accepted standard of care for a lifeguard in her response to Garcia's drowning; (5) that the Village failed to separately identify and warn of the presence of "deep water" within the designated swimming area; (6) that the Village's facility was defective and dangerous in its failure to warn of the drastic change in bottom slope and/or sudden drop off within the designated swimming area; and (7) that the

Village's facility deviated from the accepted standards of care by allowing copious amounts of underwater vegetation to exist within the designated swimming area.

{¶40} However, as found by the trial court, most of Mother's allegations have nothing to do with a physical defect on the property. For example, the Village's alleged failure to provide sufficient lifeguards, failure to appropriately train and evaluate its lifeguards, and negligent and/or reckless hiring and training of its lifeguards clearly do not concern any physical defect regarding the premise.

{¶41} The only three allegations this Court can find *may* amount to a physical defect would be the allegation that the Village failed to post signs warning of deep water, the allegation that there was copious amounts of vegetation in the designated swim area, and the allegation that there was drastic change in the slope or a sudden drop-off in the designated swim area. Nevertheless, for the following reasons, under the facts and circumstances of this particular case, we find that none of the allegations rise to the level of a physical defect for purposes of R.C. 2744.02(B)(4).

{¶42} With respect to the Village's failure to post signs warning of the presence of deep water, we find that Mother has failed to present any evidence demonstrating how this amounted to a physical defect in the property. As both parties' experts stated, deep water in public swimming areas is a common and

expected feature, especially if the facility has diving boards and slides. There is nothing in the record to suggest that this feature did not perform as intended or was less useful than designed. See *Hamrick v. Bryan City School Dist.*, 6th Dist. No. WM-10-014, 2011-Ohio-2572, ¶¶27-29 (analyzing the plain meaning of the phrase "physical defect" and concluding that the appellant failed to present evidence that there was any discernible imperfection that diminished the utility of either the bus garage or the service pit).

{¶43} Next, with respect to the copious amount of vegetation allegation, we find that, even if this amounted to a physical defect, Mother failed to present sufficient evidence that this alleged defect existed at the time of the incident. The only evidence presented by Mother in regards to the copious amount of vegetation was from the plaintiff's expert witness, who found that the designated swim area had copious amounts of vegetation. However, the plaintiff's expert made her inspection of the premises on July 6, 2010, *almost three years after the incident*, which again occurred back on August 3, 2007. There is no evidence in the record that this vegetation existed at the time of the incident.

{¶44} Finally, with respect to the sudden drop-off or drastic change in slope allegation, again we find that Mother failed to present sufficient evidence that this amounted to a physical defect. The only evidence introduced that indicates that there was such a physical defect was the affidavit from the plaintiff's expert

-23-

witness. At one point in her affidavit, the plaintiff's expert concluded that in the area where Garcia had drowned, "[s]uddenly and without warning, * * * the bottom slope suddenly and drastically changes." (Bella Aff. at 4). However, during her deposition, which had taken place prior to her affidavit, the plaintiff's expert was specifically asked whether she believed that there was a significant drop-off in the area where Garcia drowned. (Bella Depo. at 113). The plaintiff's expert replied, "I wouldn't define that area as having a significant drop-off based upon my definition." (Id.).

{¶45} "'[W]hen an affidavit is inconsistent with affiant's prior deposition testimony as to material facts and the affidavit neither suggests affiant was confused at the deposition nor offers a reason for the contradiction in her prior testimony, the affidavit does not create a genuine issue of fact which would preclude summary judgment.'" *Swiger v. Kohl's Dept. Store, Inc.*, 2nd Dist. No. 23713, 2010-Ohio-6230, ¶5, quoting *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶29, quoting *Lemaster v. Circleville Long Term Care, Inc.* (Feb. 22, 1988), 4th Dist. No. 87 CA 2, at *3. Based on the above, we find the plaintiff's expert's prior deposition testimony is inconsistent with her affidavit testimony – she testified first that there were no significant drop-offs in the area where Garcia drowned, but later averred that this area did have a sudden and drastic change, such that it made that particular area defective and dangerous.

Because there is no explanation as to the contradiction in her testimony, we find that her affidavit alone did not create a genuine issue of material fact which would have precluded summary judgment.

{¶46} Mother also tries to utilize the defense expert witness's testimony in support of her position that there was a physical defect in the property by the presence of a drastic change in slope and/or sudden drop-off. However, upon a review of the defense expert's testimony, we find that Mother has mischaracterized his testimony and has taken his conclusions out of context by only selecting certain portions of his deposition testimony to highlight on appeal. A review of the defense expert's testimony reveals that he did not find a drastic change in slope or a sudden drop-off in the area Garcia drowned. (Griffiths Depo. at 91-108).

{¶47} Nevertheless, *even if* there was sufficient evidence that these allegations involved physical defects on the premise, the fact of the matter remains that Mother failed to show how Garcia's drowning was *due to* these alleged physical defects. There was no evidence linking Garcia's drowning to any sort of vegetation in the quarry. In fact, the patron who discovered Garcia's body under water and pulled him to shore, specifically testified that Garcia had not been entangled by any obstructions when he found him at the bottom of the deep end of

the quarry. There was also evidence that there had been no noticeable trauma to Garcia's body.

**{¶48}** Furthermore, there was no evidence connecting Garcia's drowning to any drastic slope change or drop-off nor the failure to post signs warning patrons of the presence of deep water. Mother proposes a theory that Garcia drowned when he had been walking from the shallow end to the deep end when he either encountered a drop-off, a drastic change in slope, or had not been properly warned of the presence of deep water. However, the evidence indicates that Garcia had actually been swimming in the deep-end of the quarry by the diving board and slide platform before he disappeared and was found subsequently laying at the bottom of the quarry. (R. Garcia Depo. at 37-39); (L. Garcia Depo at 36). The evidence also indicates that, right before he disappeared, Garcia had decided to race his sister out to the raft, which was further away in the deep-end. (R. Garcia at 37-39). Even though Garcia's body was discovered in the deep-end of the quarry, none of the witnesses actually saw Garcia drown – no one saw him under the surface of the water, no one saw him struggling in the water, and no one saw any signs that Garcia had been in distress prior to his disappearance.

**{¶49}** Moreover, we note that, regardless of whether or not Mother presented evidence that raised questions regarding Bender's response to the incident, Mother *still* had to show that Garcia's drowning was *also* due to a

physical defect on the grounds of the quarry. As we illustrated above, Mother has failed to satisfy her burden, thus we need not discuss any questions of fact pertaining to Bender's purported negligence since Mother cannot demonstrate all of the requirements under the R.C. 2744.02(B)(4) exception.

{¶50} Therefore, we find that the trial court correctly determined that the exception to immunity pursuant to R.C. 2744.02(B)(4) was inapplicable, because Mother failed to demonstrate that there was a physical defect on the premises. Consequently, the trial court also properly concluded that the Village was entitled to immunity pursuant to R.C. 2744.02(A)(1) and did not err in granting the Village's motion for summary judgment.

{¶51} Mother's first and second assignments of error are, therefore, overruled.

### ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT ERRED IN FINDING THAT DEFENDANTS' IMMUNITY IS REINSTATED PURSUANT TO R.C. §2744.03(A)(5) AND (6).**

{¶52} In her third assignment of error, Mother argues that the trial court erred in finding that even if the Village was excepted out of immunity, the Village's immunity could nonetheless be reinstated pursuant to the defenses in R.C. 2744.03(A)(5) and (6).

{¶53} However, because we found that the exception under R.C. 2744.02(B)(4) was not applicable and that, as a result, the Village was entitled to immunity under R.C. 2744.02(A), we find that this assignment of error has been rendered moot. Thus, we decline to address the applicability of any of the defenses pursuant to R.C. 2744.03(A). App.R. 12(A)(1)(c).

{¶54} Mother's third assignment of error is, therefore, overruled as moot.

### ASSIGNMENT OF ERROR NO. IV

**THE TRIAL COURT ERRED AS A MATTER OF LAW BY FAILING TO CONSTRUE THE EVIDENCE IN A LIGHT MOST FAVORABLE TO APPELLANT.**

{¶55} Finally, in her last assignment of error, Mother argues that the trial court overall erred in failing to consider all of the evidence in a light most favorable to her, the non-moving party.

{¶56} Again, given our discussion above, we find that as it relates to the Village of Bettsville and the Bettsville Board of Recreation, the trial court did not err in granting summary judgment in their favor.

{¶57} As it relates to Bender, it appears that Mother has not raised any specific claim regarding Bender's liability on appeal. Nevertheless, to the extent Mother *may have* raised any issues regarding Bender's liability on this appeal, we note that, pursuant to R.C. 2744.03(A)(6), Bender was entitled to immunity unless Mother showed that one of the exceptions in R.C. 2744.03(A)(6) applied. *Hawk v.*

*Am. Elec. Power Co.*, 3d Dist. No. 1-04-65, 2004-Ohio-7042, ¶10, quoting *Wooton v. Vogele* (2001), 147 Ohio App.3d 216, 221, 796 N.E.2d 889. Based on Mother's arguments, the only exception that could apply would be R.C. 2744.03(A)(6)(b), thus Bender would be entitled to immunity unless her "acts or omissions were with malicious purpose, in bad faith, or [done] in a wanton or reckless manner." However, when reviewing Mother's complaint, we find that she only alleged that Bender acted *negligently* and did not assert any other culpability higher than negligence in the proceedings below. Therefore, because there were never any allegations that Bender acted "with malicious purpose, in bad faith, or in a wanton or reckless manner," we find that Bender was immune from liability and that the trial court also did not err in granting summary judgment in Bender's favor.

{¶58} Mother's fourth assignment of error is, therefore, overruled.

{¶59} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**ROGERS, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**