[Cite as *Nonprasit v. Ohio Teaching Family Assn.*, 2022-Ohio-3685.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Sandra Nonprasit, Administratrix of the
Estate of Pedro Salinas

     Plaintiff

v.

Ohio Teaching Family Association, et al.

     Appellees

v.

Sylvania Area Joint Recreation District

     Appellant

Court of Appeals No.  L-22-1027

Trial Court No.  CI0202001404

**DECISION AND JUDGMENT**

Decided:  October 14, 2022

* * * * *

J. Mark Trimble, Tracy B. Selis, and Andrew J. Ayers, for Appellees.

Byron S. Choka and Jennifer A. McHugh, for appellant.

* * * * *

**ZMUDA, J.**

## I.     Introduction

{¶ 1} Appellant, Sylvania Area Joint Recreation District (SAJRD), appeals the

judgment of the Lucas County Court of Common Pleas, finding that a genuine issue of

material fact exists as to whether SAJRD is entitled to political subdivision immunity and thus denying SAJRD's motion for summary judgment. Because we find that SAJRD is entitled to immunity as a matter of law, we reverse.

## A.    Facts and Procedural Background

{¶ 2} This appeal arises out of the tragic death of a 15-year-old boy, P.S., on July 1, 2019. At the time, P.S. was under the care and supervision of appellees, the Ohio Teaching Family Association (OTFA) and its teaching parent, Matt Anderson. OTFA is a residential care facility for minors and, as such, received custody of P.S. after he was transferred to OTFA from the Lucas County Youth Treatment Center, where he was previously incarcerated.

{¶ 3} On July 1, 2019, OTFA transported P.S. and four other residents to the Centennial Quarry for a field trip. The Centennial Quarry is a public recreational swimming area that is located in Sylvania, Ohio, and owned by SAJRD, an Ohio political subdivision. Upon arrival at the quarry, P.S. and the other residents began swimming. Anderson accompanied the group to supervise. According to Anderson, the swimming area was crowded at the time.

{¶ 4} P.S. jumped off the 15-foot-high dive platform and into the quarry, about 20-30 feet from shore. When P.S. did not resurface, the other residents notified Anderson that P.S. was missing, prompting a search. Several minutes later, another swimmer pulled P.S. from the water. Lifeguards immediately began to administer CPR and other

2.

aid to P.S., and continued to do so until EMTs arrived.  P.S. was eventually transferred to the University of Toledo Medical Center where he was pronounced dead.

{¶ 5} Approximately seven months after P.S.'s death, on February 7, 2020, Sandra Nonprasit, administratrix of P.S.'s estate, filed a wrongful death action against appellees. In her complaint, Nonprasit sought damages from appellees in the amount of $750,000.

{¶ 6} On February 19, 2020, appellees filed an answer and a third party complaint, in which they denied any liability for P.S.'s death and asserted that any damages they incurred were brought about by SAJRD's failure to supervise P.S. while he was a business invitee on SAJRD's property.

{¶ 7} SAJRD filed an answer to appellees' third party complaint on March 16, 2020.  In its answer, SAJRD denied any liability arising out of P.S.'s death and asserted several affirmative defenses including political subdivision immunity.

{¶ 8} Thereafter, the matter proceeded through pretrial discovery.  On January 11, 2021, SAJRD filed a motion for summary judgment, arguing that it was entitled to judgment on appellees' third party complaint because it was immune from suit under Chapter 2744 of the Revised Code.  In support of its argument, SAJRD cited to deposition testimony previously provided by Anderson and SAJRD's senior program director, Rob Mahon.  Both of these depositions were filed with the trial court and part of the record at the time SAJRD filed its motion.

3.

{¶ 9} In his deposition, Anderson testified that he and the five OTFA residents arrived at Centennial Quarry at around 3:00 p.m. on July 1, 2019. When they arrived, Anderson noticed that the swimming area was very crowded with "at least 200" swimmers present. When asked about the physical characteristics of the quarry, Anderson stated that the water was deep, with a sudden drop off after entering the water. He was unaware of any underwater obstructions in the quarry. Anderson could not identify any defects with the quarry that hindered its operability as a swimming facility.

{¶ 10} Anderson decided to snorkel for some time. While snorkeling, Anderson observed three lifeguards in the area. Anderson finished snorkeling and proceeded to the diving platform area, where he saw no additional lifeguards.

{¶ 11} Anderson and some of the other OTFA residents, including P.S., decided to jump into the water from the diving platform, which was approximately ten feet above the water. Anderson jumped from the diving platform two times before noticing that P.S. was missing. Because the swimming area was so crowded, Anderson was forced to swim around several people on his way back to shore after jumping into the water. Consequently, Anderson was "out of breath completely" by the time he returned to the shore the second time. According to Anderson, P.S. jumped into the water following Anderson's second jump, although he was not certain of that fact prior to the incident.

{¶ 12} While catching his breath on the shore, Anderson was approached by another resident who told him that P.S. was missing. Anderson was concerned that P.S.

4.

had run off and escaped, so he started searching the area outside the water. He then alerted lifeguards of the situation, at which point he observed a diver pulling P.S. from the water and ran over to provide assistance.

{¶ 13} At the deposition, Anderson authenticated several photographs of the quarry, including photographs of the diving platform area. In the photographs of the diving platform area, a lifeguard chair is visible on the platform immediately adjacent to the location from which divers would jump. According to Anderson, this chair was not manned on the day of the drowning. Other photographs of the quarry revealed the existence of a surface-level lifeguard chair in the area where Anderson went snorkeling, with a direct line of sight to the diving platform above it, as well as an elevated lifeguard chair in an area of the quarry that Anderson was unable to identify.

{¶ 14} Toward the end of his deposition, Anderson stated that the lifeguards he observed on the day of the drowning appeared to have their attention focused on an area in the middle of the quarry where floating platforms were located. Anderson indicated that the lifeguards were not paying attention to the diving platform, and he stated that, were he the manager of the quarry, he would have had a lifeguard stationed "up on the platform." When asked if the chair on the platform provided a good line of sight to the diving area, Anderson responded: "If I were to have been sitting up there and looked right, yeah, you could have seen that, but it's also directionalized (sic.) out in the area that

5.

we were swimming in, and not at the platform. The platform chair up there would have been the one that would probably be responsible for that area."

{¶ 15} In addition to referencing Anderson's deposition in its motion for summary judgment, SAJRD also cited evidence from Mahon's deposition. At the beginning of his deposition, Mahon explained the physical layout of the quarry. He described the quarry as a "spring-fed quarry" that is more difficult to lifeguard because the water is cloudy and thus one cannot see the bottom. Further, Mahon indicated that the sides of the quarry all contain sudden drop-offs, with the sole exception being the stair stepped entryway. Mahon stated that there is no vegetation or rocks that would impede swimmers in the swimming area.

{¶ 16} According to Mahon, there are five lifeguard chairs at the quarry, plus two lifeguard stations at the slide located at the quarry. Three of these chairs are on the south beach of the quarry (Chairs 2, 3 and 4), and the remaining two chairs (Chairs 1 and 1 & 1/2) are located on north beach. Mahon indicated that there were no lifeguards assigned to the chair that sits atop the diving platform (Chair 1 & 1/2) at the time of P.S.'s drowning. Mahon explained the reason that the chair was not staffed, stating:

> So to give you the background on that chair because I know it's in an area
>
> of interest, we always station Lifeguard Chair 1, which is at the bottom of
>
> the stairs on what we call north beach, the main entrance in. That chair
>
> next to the platform is what we call Chair 1 & 1/2, and that is primarily

6.

used in the evenings or on days where the sun affects the guard in Chair 1.

So Chair 1 faces essentially west kind of southwest * * *.

{¶ 17} When asked to further explain the staffing situation on north beach, Mahon clarified that a lifeguard is required to be in Chair 1 at all times, unless the sunset makes it difficult to see, in which case the lifeguard moves from Chair 1 to Chair 1 & 1/2. Further, a lifeguard is supposed to be in Chair 2 (located on south beach) when the diving platform is in consistent use. However, no such lifeguard was in Chair 2 on day P.S. drowned. Mahon testified that the diving platform falls within the responsibilities of Chair 1, but Chair 2 is also used for the diving platform when there is a lineup of swimmers on the platform. Mahon explained that both Chair 1 and Chair 2 have good vantage points from which to watch divers as they jump off the diving platform. Moreover, Mahon testified that Chair 3 also has a good vantage point of the platform, but it too was unmanned on the day of the drowning. Mahon confirmed that none of the lifeguards who were on duty saw P.S. jump off the diving platform or resurface at any point in time.

{¶ 18} In response to SAJRD's motion for summary judgment, appellees filed a memorandum in opposition on April 13, 2021. In their memorandum, appellees conceded that SAJRD is a governmental entity entitled to immunity under R.C. Chapter 2744. However, appellees insisted that immunity does not apply in this case because P.S.'s death was caused by physical defects at the quarry and thus immunity was

7.

excepted under R.C. 2744.02(B)(4). The physical defects identified by appellees were two-fold. First, appellees complained of "unfiltered and cloudy" water that allegedly obstructed the view of lifeguards positioned at the quarry. Second, appellees contended that lifeguard stations were situated "away from the diving platform instead of next to it" and "at a low perspective relative to the water surface," making it difficult to see swimmers who were in distress below the surface of the water in light of the murky water conditions.

{¶ 19} To support their argument, appellees relied upon an affidavit from an expert in aquatic safety and lifeguard instruction, Brett Galambos. In his affidavit, Galambos acknowledged that P.S. was an experienced swimmer who showed no signs of difficulty in swimming prior to jumping into the quarry from the high dive platform on July 1, 2019. However, Galambos noted that the quarry contains cloudy water that is spring fed, and thus "the water level frequently changes, causing variations in water quality and visibility." Moreover, Galambos asserted that only one of the two lifeguard stations on the north beach of the quarry was staffed at the time of the drowning, namely Chair 1 which is at ground level and 30 feet away from the dive platform. Thus, Galambos reasoned that the lifeguards on duty at the time of the drowning failed to supervise the dive platform and ensure that all divers resurfaced after diving. Galambos stated that the positioning and elevation of Chair 1 constituted a physical defect that

8.

contributed to the lifeguards' failure to observe P.S. in distress and render aid accordingly.

{¶ 20} Notably, Galambos expressed his expert opinion that "positioning a lifeguard in a chair at a higher angle, such as at the diving platform [Chair 1 & 1/2] would have provided a better vantage point for a lifeguard to observe any distress of a swimmer entering the water after jumping from the platform." Galambos went on to opine that "a lifeguard stationed at that diving platform, focused on that specific diving platform, would have an increased ability to reach a swimmer in distress, before the swimmer began to drown, because the lifeguard would observe each swimmer jumping from the diving platform."

{¶ 21} On April 29, 2021, SAJRD filed its reply and reiterated its immunity arguments previously raised in the motion for summary judgment.

{¶ 22} Upon consideration of the parties' arguments, the trial court issued its decision on January 13, 2022. In its decision, the trial court noted that this case distilled down to one question; namely, "[w]as there a physical defect on SAJRD's property which contributed to [P.S.'s] death?" The court then reviewed the case law cited by appellees, namely *Kerber v. Cuyahoga Hts.*, 8th Dist. Cuyahoga No. 102419, 2015-Ohio-2766, as well as the case law cited by SAJRD, namely *Contreraz v. Bettsville*, 3d Dist. Seneca No. 13-10-48, 2011-Ohio-4178. The trial court found that *Kerber* was more analogous to the facts of the present case than *Contreraz*. Thus, the court concluded that

9.

appellees presented sufficient evidence to create a genuine issue of material facts as to whether SAJRD's placement of lifeguard chairs at the quarry was a physical defect that led to P.S.'s death under R.C. 2744.02(B)(4). Moreover, the trial court determined that the question of whether immunity should be reinstated under R.C. 2744.03(A)(5) was a factual one not suitable for resolution on summary judgment. Consequently, the trial court denied SAJRD's motion for summary judgment.

{¶ 23} Thereafter, on February 9, 2022, SAJRD filed its timely notice of appeal.

### B. Assignments of Error

{¶ 24} On appeal, SAJRD assigns the following errors for our review:

ASSIGNMENT OF ERROR NO. 1: The trial court committed reversible error when it found a genuine issue of material fact regarding whether the "physical defect" exception to immunity applied under Ohio R.C. §2744.02(B)(4), where the Third-Party Complaint pleads no facts or allegations supporting the existence of any physical defect, that any alleged physical defect was a proximate cause of [P.S.'s] drowning; or that any alleged negligence by an SAJRD employee was connected to any physical defect or a proximate cause of [P.S.'s] drowning.

ASSIGNMENT OF ERROR NO. 2: The trial court committed reversible error when it found a genuine issue of material fact regarding whether the "physical defect" exception to immunity applied under Ohio

10.

R.C. §2744.02(B)(4), where no Ohio Civ.R. 56 evidence supports the existence of any physical defect; that any alleged physical defect was a proximate cause of [P.S.'s] drowning; or that any alleged negligence by an SAJRD employee was connected to any physical defect or a proximate cause of [P.S.'s] drowning.

ASSIGNMENT OF ERROR NO. 3: Even if the R.C. §2744.02(B)(4) exception applied, the trial court committed reversible error when it found a genuine issue of material fact regarding whether the discretionary defense applied to reinstate SAJRD's immunity pursuant to Ohio R.C. §2744.03(A)(5), where the Third-Party Complaint pleads no facts or allegations supporting any heightened state of culpability, and only alleges mere negligence.

ASSIGNMENT OF ERROR NO. 4: Even if the R.C. §2744.02(B)(4) exception applied, the trial court committed reversible error when it did not reinstate SAJRD's statutory immunity pursuant to the discretionary defense in Ohio R.C. §2744.03(A)(5), because to the extent any injury or death allegedly arose from any action or inaction of SAJRD, it was the result of an exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources, which was not exercised with

malicious purpose, in bad faith, or in a wanton or reckless manner as a matter of law.

ASSIGNMENT OF ERROR NO. 5: The trial court committed reversible error and abused its discretion when it granted leave to amend the Third-Party Complaint where Civ.R. 15(B) does not apply since a trial has not yet occurred; where the Third-Party Complaint does not plead, and waived, any exception to immunity pursuant to R.C. §2744.02(B); where the Third-Party Complaint failed to plead, and waived, any heightened state of culpability pursuant to R.C. §2744.03(A)(5); where no motion for leave to amend ever was filed; where permitting leave to amend would cause substantial and unfair prejudice to SAJRD; where Third-Party Plaintiffs engaged in undue delay and a lack of good faith; and where amendment would be futile.

ASSIGNMENT OF ERROR NO. 6: The trial court committed reversible error when it denied summary judgment in favor of SAJRD.

{¶ 25} For the reasons that follow, we conclude that the trial court erred in finding that there is a genuine issue of material fact regarding the applicability of the physical defect exception to immunity under R.C. 2744.02(B)(4). Consequently, we need only address SAJRD's first, second, and sixth assignments of error, which are interrelated and therefore will be considered together. Our determination in SAJRD's favor on those

12.

assignments of error renders the remaining assignments of error moot, and we will therefore not consider them.

## II.     Analysis

### A.     Standard of Review

{¶ 26} This appeal is before us on the trial court's disposition of SAJRD's motion for summary judgment. We review the grant or denial of a motion for summary judgment de novo, applying the same standard as the trial court. *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989); *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Under Civ.R. 56(C), summary judgment is appropriate where (1) no genuine issue as to any material fact exists; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978).

{¶ 27} A "material fact" is one which would affect the outcome of the proceeding under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304, 733 N.E.2d 1186 (6th Dist.1999); *Needham v. Provident Bank*, 110 Ohio App.3d 817, 826, 675 N.E.2d 514 (8th Dist.1996), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Additionally, "[w]hether a political subdivision or its employee may invoke statutory immunity under

13.

R.C. Chapter 2744 generally presents a question of law." *Hoffman v. Gallia Cty. Sheriff's Office*, 2017-Ohio-9192, 103 N.E.3d 1, ¶ 38 (4th Dist.).

{¶ 28} On a motion for summary judgment, the moving party has the burden of demonstrating that no genuine issue of material fact exists. *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (1996). In doing so, the moving party must point to some evidence in the record in the form of "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action[.]" Civ.R. 56(C); *Dresher* at 292-293. The burden then shifts to the nonmoving party to provide evidence showing that a genuine issue of material fact does exist. *Dresher* at 293. The failure to satisfy this reciprocal burden warrants judgment against the nonmoving party. *Id.*

## B. Law Governing Claims of Political Subdivision Immunity

### i. The Relevant Analytical Framework

{¶ 29} As a matter of public policy in Ohio, the Ohio General Assembly "has classified the functions of political subdivisions as 'governmental' or 'proprietary,'" *Hamrick v. Bryan City Sch. Dist.*, 6th Dist. Williams No. WM-10-014, 2011-Ohio-2572, ¶ 16, and has blanketed such political subdivisions with statutory immunity by enacting the Political Subdivision Tort Liability Act, codified in Chapter 2744 of the Ohio Revised Code.

14.

{¶ 30} "Under Ohio law, courts apply a 'three-tiered analysis' in determining whether a political subdivision is entitled to immunity under R.C. Chapter 2744." *Douglas v. Columbus City Schools Bd. of Ed.*, 2020-Ohio-1133, 152 N.E.3d 1245, ¶ 16 (10th Dist.), quoting *Smith v. McBride*, 130 Ohio St.3d 51, 2011-Ohio-4674, 955 N.E.2d 954, ¶ 13. First, we must examine whether the political subdivision is entitled to the "general grant of immunity" provided by R.C. 2744.02(A)(1). *McBride* at ¶ 16. This general grant provides statutory immunity to political subdivisions for "damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." R.C. 2744.02(A)(1).

{¶ 31} If immunity is found at this initial level, the law next requires analysis of the second tier, which requires an examination as to whether any of the five exceptions to the general grant of political subdivision immunity are applicable under R.C. 2744.02(B). *Id.* at ¶ 14.

{¶ 32} Even if an exception to the general grant of immunity set forth in R.C. 2744.02(A)(1) applies and such immunity is thereby abrogated, our analysis of the immunity question is not complete. Under the third tier of our analysis, we must then examine "whether any defenses in R.C. 2744.03 apply to reinstate immunity." *McBride* at ¶ 15, citing *Colbert v. Cleveland*, 99 Ohio St.3d 215, 2003-Ohio-3319, 790 N.E.2d 781, ¶ 9.

15.

{¶ 33} The first tier of the analysis concerning the general grant of immunity is not in dispute in this case. Under R.C. 2744.01(F), a "political subdivision" is defined as "a municipal corporation, township, county, school district, or other body corporate and politic responsible for governmental activities in a geographic area smaller than that of the state." Further, R.C. 2744.01(C)(2)(u)(iv) provides that a "governmental function" includes the "design, construction, reconstruction, renovation, repair, maintenance, and operation of * * * any recreational area or facility, including, but not limited to, * * * [a] bath, swimming pool, pond, water park, wading pool, wave pool, water slide, or other type of aquatic facility."

{¶ 34} Appellees concede that SAJRD meets the definition of a political subdivision and that its operation of the Centennial Quarry swimming area constitutes a governmental function. Thus, SAJRD is indisputably entitled to the general grant of immunity under R.C. 2744.025(A)(1). Consequently, we must proceed to the second tier of our immunity analysis. As explained below, we find under the second tier that appellees have not demonstrated that an exception to the general grant of immunity applies. Consequently, we do not reach the third tier of the immunity analysis in this case.

### ii. The "Physical Defect" Exception to Immunity

{¶ 35} In the second tier of the analysis, we must examine whether any exceptions to immunity are applicable. Here, appellees rely upon only one of the exceptions to

16.

immunity under R.C. 2744.02(B). Specifically, appellees argue that the "physical defect" exception outlined in R.C. 2744.02(B)(4) is applicable in this case.

{¶ 36} R.C. 2744.02(B)(4) provides an exception to statutory immunity for injury, death, or loss to person or property that is "caused by the negligence of their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function." While the phrase "physical defect" is not defined in the Revised Code, we have construed it as "a perceivable imperfection that diminishes the worth or utility of the object at issue." *Hamrick* at ¶ 28.

{¶ 37} Construing the statutory language used in R.C. 2744.02(B)(4), we observed in *Hamrick*, *supra*, that the general immunity afforded political subdivisions engaged in a governmental activity under the first tier of the immunity analysis is only abrogated under the second tier "if an injury is: 1) caused by employee negligence, 2) on the grounds or in buildings used in connection that governmental activity, and 3) due to physical defects on or within those grounds or buildings. All of these characteristics must be present." *Hamrick* at ¶ 25; *see also Parmertor v. Chardon Local Schools*, 2016-Ohio-761, 47 N.E.3d 942, ¶ 16 (11th Dist.) ("R.C. 2744.02(B)(4) requires the injuries at issue to be caused *both* by a political-subdivision employee's negligence *and* a physical defect on the grounds." (Emphasis sic.)).

17.

**{¶ 38}** "Ohio cases addressing the 'physical defect' exception in general involve physical defects as part of the structure of buildings and the maintenance of those structures." *Douglas*, *supra*, 152 N.E.3d 1245, 2020-Ohio-1133, at ¶ 25. Further, "Ohio courts have expanded the definition of 'physical defect' to include equipment that did not operate as intended due to a perceivable condition." *Jacobs v. Oakwood*, 8th Dist. Cuyahoga No. 103830, 2016-Ohio-5327, ¶ 26. However, "Courts have determined that premises are not considered physically defective based solely upon an allegation that modifications or improvements may render them safer." *Id.* at ¶ 23, citing *Piispanen v. Carter*, 11th Dist. Lake No. 2005-L-133, 2006-Ohio-2382, ¶ 21 (an assault on school grounds was not the result of a physical defect on the grounds, even though the plaintiff alleged the assault was a result of the board's failure to provide a safe and secure environment and failure to warn of the danger posed by the assailant), *Duncan v. Cuyahoga Cmty. College*, 2012-Ohio-1949, 970 N.E.2d 1092, ¶ 27 (8th Dist.) (community college's failure to use mats on floors while conducting a self-defense class was not a "physical defect" as used in R.C. 2744.02(B)(4)), and *Hamrick*, supra, at ¶ 29 (a bus-garage service pit into which the plaintiff fell was not a physical imperfection and thus not a defect for purposes of removing immunity under R.C. 2744.02(B)(4)).

18.

## C.  Application of the Law to this Case

{¶ 39} Having set forth the analytical framework that governs the immunity issue before us in this appeal, we turn now to the application of that framework to the facts of this case.

{¶ 40} In terms of whether SAJRD qualifies for immunity under the first tier of the analysis, we note that appellees do not dispute that SAJRD is a political subdivision whose maintenance and operation of Centennial Quarry meets the definition of a governmental function under R.C. 2744.01(C)(2)(u)(iv).  Consequently, the parties agree that SAJRD is entitled to the general grant of immunity under R.C. 2744.02(A)(1).

{¶ 41} In the second tier of the analysis, we must consider whether any of the exceptions to immunity under R.C. 2744.02(B) apply.  In doing so, we will limit our analysis to the physical defect exception set forth in R.C. 2744.02(B)(4) since, as already noted, that is the only exception identified by appellees as potentially applicable.

{¶ 42} In its brief to this court, SAJRD argues that the trial court erred in finding a genuine issue of material fact as to the applicability of the physical defect exception, insisting that appellees presented no evidence to establish that any physical defect existed on the grounds of the Centennial Quarry on the day of P.S.'s death.  We agree.

{¶ 43} The burden of demonstrating the applicability of an exception to the general grant of immunity lies with appellees in this case.  *See Contreraz*, *supra*, 3d Dist. Seneca No. 13-10-48, 2011-Ohio-4178, at ¶ 23 ("Once general immunity has been

19.

established by the political subdivision, the burden lies with the plaintiff to show that one of the five exceptions under R.C. 2744.02(B) apply.") In the trial court, appellees argued that P.S.'s death was the result of physical defects at the Centennial Quarry including unfiltered and cloudy water and poorly configured lifeguard stations. On appeal, appellees reference these alleged physical defects only by implication, and instead focus on the location and actions of the lifeguards who were on duty at the time of P.S.'s death.

{¶ 44} According to appellees, they presented evidence that the lifeguards "were not in the correct positions to observe the area where [P.S.] entered the water" and "did not occupy an observation point by the diving platform." Further, appellees claim that their evidence demonstrates that the lifeguards failed to ensure P.S. was properly clothed for swimming (i.e. he was wearing "long pants, reducing buoyancy"), failed to observe P.S. enter the water where there are "deep drop-offs and cloudy conditions making observation difficult," and failed to detect that P.S. was in distress in a timely fashion. Appellees also claim that the evidence reveals the lifeguards were delayed in their reaction to the situation upon learning that P.S. was missing.

{¶ 45} In its brief to this court, SAJRD contends that there is no evidence of a physical defect on the quarry premises, and further that appellees' evidence demonstrates employee negligence, at most. SAJRD argues that such evidence of negligence does not establish the existence of a physical defect necessary to establish an exception to the general grant of immunity.

20.

{¶ 46} At the outset, we agree with SAJRD that most of the evidence relied upon by appellees and set forth above refers to the alleged negligence of SAJRD employees, not to a physical defect at the Centennial Quarry. Indeed, only the water quality and configuration of the lifeguard stations have any potential connection to the quarry property itself. Therefore, we now turn to an examination of whether these two conditions constituted physical defects that contributed to P.S.'s death.

{¶ 47} In support of its argument that these conditions do not constitute physical defects, SAJRD cites to *Contreraz, supra*, 3d Dist. Seneca No. 13-10-48, 2011-Ohio-4178. In response, appellees cite to *Kerber*, *supra*, 8th Dist. Cuyahoga No. 102419, 2015-Ohio-2766, and contend that it supports their assertion that the quarry's configuration of lifeguard stations meets the definition of a physical defect such that SAJRD's immunity is abrogated. We will examine these cases in detail.

{¶ 48} *Contreraz* involved the tragic death of a 15-year-old swimmer, Santos Garcia, who drowned in the Eells Park Quarry, a public recreational swimming area. Prior to the drowning, Garcia and his sister agreed to race to a raft that was floating in the deep end of the quarry. *Id.* at ¶ 7. Once Garcia's sister arrived at the raft, she turned around to look for Garcia. *Id.* When she did not see Garcia resurface, she yelled for help and announced that Garcia was missing. *Id.* Moments later, "a swimmer surfaced with Garcia." *Id.* Efforts to resuscitate Garcia began, and he was transferred to the hospital, but such efforts were unsuccessful. *Id.* at ¶ 14.

21.

{¶ 49} Garcia's mother, Rosalinda Contreraz, individually and as the administratrix of Garcia's estate, brought a wrongful death action against the village of Bettsville (the owner of the quarry), the Bettsville Recreation Board (the operator of the quarry), and Andrea Bender (the on-duty lifeguard at the quarry). *Id.* at ¶ 1-5. The defendants filed a motion for summary judgment in which they asserted that they were immune from suit. Upon review, the trial court granted the defendants' motion and found that Contreraz failed to establish that Garcia's death was due to a physical defect at the quarry. *Id.* at ¶ 19.

{¶ 50} Contreraz appealed to the Third District and argued that the trial court erred in granting summary judgment notwithstanding evidence of seven violations committed by the village of Bettsville, including:

(1) that the Village was negligent per se and/or reckless by failing to have the required number of lifeguards; (2) that the Village failed to appropriately train and evaluate their lifeguard staff; (3) that the Village was negligent and/or reckless in their hiring and training of lifeguard Andrea Bender; (4) that Andrea Bender fell below the accepted standard of care for a lifeguard in her response to Garcia's drowning; (5) that the Village failed to separately identify and warn of the presence of "deep water" within the designated swimming area; (6) that the Village's facility was defective and dangerous in its failure to warn of the drastic change in

22.

bottom slope and/or sudden drop off within the designated swimming area; and (7) that the Village's facility deviated from the accepted standards of care by allowing copious amounts of underwater vegetation to exist within the designated swimming area.

*Id.* at ¶ 39.

**{¶ 51}** The court of appeals reviewed these alleged violations and found that most of them had "nothing to do with a physical defect on the property. For example, the Village's alleged failure to provide sufficient lifeguards, failure to appropriately train and evaluate its lifeguards, and negligent and/or reckless hiring and training of its lifeguards clearly do not concern any physical defect regarding the premise." *Id.* at ¶ 40. The court then examined the remaining three alleged violations concerning the failure to post signs warning of deep water, the excessive vegetation at the quarry, and sudden drop-off in the designated swimming area, but found that none of these violations amounted to a physical defect under R.C. 2744.02(B)(4). *Id.* at ¶ 41.

**{¶ 52}** The court found that the failure to post appropriate signage was not a physical defect at all since "deep water in public swimming areas is a common and expected feature, especially if the facility has diving boards and slides" and thus the quarry performed as intended. *Id.* at ¶ 42, citing *Hamrick*, *supra*, 6th Dist. Williams No. WM-10-014, 2011-Ohio-2572, at ¶ 27-29. Further, the court concluded that Contreraz failed to present any evidence to show that there was excessive vegetation at the quarry

23.

on the day of Garcia's drowning. *Id.* at ¶ 43. The court also found that Contreraz's evidence did not establish the existence of a sudden drop-off at the quarry. *Id.* at ¶ 44. Finally, the court observed that Contreraz failed to establish that Garcia's drowning was due to any vegetation or slope changes at the quarry. *Id.* at ¶ 47-49. In light of these findings, the court held that Contreraz failed to meet her burden to demonstrate the presence of a physical defect on the premises of the quarry and upheld the trial court's determination that the physical defect exception under R.C. 2744.02(B)(4) was inapplicable. *Id.* at ¶ 50.

{¶ 53} In some respects, *Contreraz* is analogous to the present case. First, both cases involve claims of political subdivision immunity raised by owners of outdoor recreational swimming quarries. Second, in each case the plaintiffs raised arguments that the quarries were physically defective due to water conditions and the manner in which lifeguards carried out their duties.

{¶ 54} Upon review, we find *Contreraz* instructive as to one of the two alleged physical defects appellees identified by appellees, namely the condition of the water at the Centennial Quarry. As with the argument rejected by the court in *Contreraz* that the lack of signage warning of deep water was a physical defect, we find no merit to appellees' contention that the "unfiltered and cloudy" water at the quarry constitutes a physical defect. The court in *Contreraz* took note of the deep water that is typical of a swimming quarry and found that the presence of such conditions did not prevent the

24.

quarry from performing as intended. Similarly, we cannot ignore the obvious fact that unfiltered and cloudy water is a common element of an outdoor, spring-fed swimming quarry. As such, it is a *feature* of swimming quarries, not an imperfection that diminishes the worth or utility of the quarry. Moreover, as in *Contreraz*, there is no evidence that cloudy water contributed to the drowning in this case. Indeed, there is no evidence of drowning mechanics itself.

{¶ 55} As to the second alleged physical defect identified by appellees, namely the configuration of lifeguard stations at the quarry, *Contreraz* is distinguishable. Indeed, the plaintiff in *Contreraz* did not identify the configuration of lifeguard stations as a physical defect at the quarry, as appellees do here. On this issue, therefore, we find that *Contreraz* provides little guidance.

{¶ 56} This brings us to *Kerber*, the case appellees chiefly rely upon in support of their argument and the case on which the trial court based its decision to deny SAJRD's motion for summary judgment.

{¶ 57} In *Kerber*, the administrator of the estate of Daniel Papcke filed a wrongful death action against the village of Cuyahoga Heights, the Cuyahoga Heights Board of Education, and two lifeguards, Cynthia Lusk and Courtney Stock, after Papcke drowned at an indoor pool located inside the Cuyahoga Heights High School. *Kerber*, *supra*, 8th Dist. Cuyahoga No. 102419, 2015-Ohio-2766, at ¶ 2. Following discovery, the defendants filed a motion for summary judgment, arguing that they were entitled to

25.

political subdivision immunity under R.C. Chapter 2744. *Id*. at ¶ 3. The trial court ultimately denied the motion after it found that there was a genuine issue of material fact as to whether Papcke's death was caused by lifeguard negligence and physical defects at the indoor pool facility. *Id.*

{¶ 58} Relevant here, there were two lifeguard chairs covering the indoor pool on the day of the drowning: "a high one, which had not been used in years, and a short one, which Stock was using on the evening in question. The short chair was positioned in front of the shallow end of the pool." *Id.* at ¶ 6. As to the higher lifeguard chair, Lusk testified that the chair was only used prior to the removal of the high diving board, because it was "easier to see the pool from the lower [chair]." *Id.* at ¶ 7. Since the high diving board was removed, the high chair was no longer in use. *Id.*

{¶ 59} After the trial court denied their motion for summary judgment, the defendants appealed, and argued that the trial court erred in denying the motion for summary judgment. *Id.* at ¶ 14. On review, the Eighth District identified the "main issue" as "whether, under the second tier [of the immunity analysis], any exceptions to immunity apply." *Id.* at ¶ 19. The court went on to note the physical defect exception under R.C. 2744.02(B)(4) was the only exception that was relevant. *Id.*

{¶ 60} After examining the evidence as to whether the lifeguards were perhaps negligent and concluding that there was at least a genuine issue of material fact on that issue, the court turned its attention to the question of whether there was a physical defect

26.

on the pool grounds that contributed to the drowning. In doing so, the court zeroed in on the "short, low deck chair, which was positioned at the pool's edge." *Id.* at ¶ 24. The court took special note of Stock's deposition testimony, during which she acknowledged that she could not see Papcke struggling in the water from her vantage point sitting on the short chair. *Id.* Further, the court referenced the affidavit of plaintiff's aquatic safety expert, who opined that the placement of the short chair was ineffective and reduced the sight lines of the on-duty lifeguards, thereby delaying the lifeguards from responding in a timely fashion in Papcke's moment of distress. *Id.* at ¶ 25.

{¶ 61} Taken together, the court of appeals found that Stock's acknowledgement and the expert's affidavit created a genuine issue of material fact as to whether the use of a low deck lifeguard chair created a physical defect at the indoor pool. *Id.* at ¶ 26. The court then proceeded to examine the defendants' immunity claim under the third tier of the analysis to determine whether immunity should be reinstated as a matter of law, and concluded that a genuine issue of material fact existed on this issue as well, thereby precluding summary judgment. *Id.* at ¶ 31.

{¶ 62} Having compared *Kerber* to this case, we find it analogous in some respects. Like the plaintiff in *Kerber*, appellees identify the lifeguard chairs used at the quarry as a physical defect in this case. Moreover, both cases involve multiple lifeguard chairs, only one of which was manned at the time of the drowning.

27.

{¶ 63} However, in the final analysis, we find that *Kerber* is distinguishable from this case in at least one important respect. As noted above, the indoor swimming facility at issue in *Kerber* contained two lifeguard chairs, a high chair and a low chair, but the high chair was no longer in use. Thus, the facility effectively had one lifeguard chair, a short one that the plaintiff's expert opined did not have adequate sight lines to cover the entire swimming pool.

{¶ 64} By contrast, the Centennial Quarry contains five lifeguard chairs plus two additional lifeguard stations at the bottom and top of the water slide. All of these lifeguard stations are used by lifeguards at various times according to the discretion of the lifeguards who are on duty. Unlike in *Kerber*, where the lifeguards only used a surface-level lifeguard chair, the lifeguards at the quarry were able to make use of surface-level and elevated lifeguard chairs, including Chair 1 & 1/2, which was elevated and positioned immediately adjacent to the diving platform.

{¶ 65} In supporting their contention that Chair 1 was physically defective because it was not elevated and thus did not provide a line of sight to the diving platform or an adequate view into the water around where P.S. dove into the water from the platform, appellees rely upon the affidavit completed by Galambos. In his affidavit, Galambos stated that the positioning and elevation of Chair 1 constituted a physical defect that contributed to the lifeguards' failure to observe P.S. in distress and render aid accordingly. However, Galambos acknowledged that Chair 1 & 1/2 was appropriately

28.

positioned to enable effective lifeguarding of the diving platform area and the swimming area below. Galambos stated that "positioning a lifeguard in a chair at a higher angle, such as at the diving platform [Chair 1 & 1/2] would have provided a better vantage point for a lifeguard to observe any distress of a swimmer entering the water after jumping from the platform." Galambos further opined that "a lifeguard stationed at that diving platform, focused on that specific diving platform, would have an increased ability to reach a swimmer in distress, before the swimmer began to drown, because the lifeguard would observe each swimmer jumping from the diving platform."

{¶ 66} Taken together, Galambos's testimony evidences, at most, SAJRD's negligence pertaining to the staffing decision not to have a lifeguard stationed at Chair 1 1/2. The testimony does not establish that Chair 1 was physically defective. Thus, the evidence relied upon by appellees to satisfy their burden of demonstrating the existence of a genuine issue of material fact as to whether a physical defect existed and whether its existence led to the death of P.S. is unavailing.

{¶ 67} First, this evidence does not establish the existence of a physical defect. To reiterate, a physical defect is defined as "a perceivable imperfection that diminishes the worth or utility of the object at issue." *Hamrick*, *supra*, 6th Dist. Williams No. WM-10-014, 2011-Ohio-2572, at ¶ 28. The testimony of appellees' own expert makes it clear that in this case, unlike in *Kerber*, the placement and design of Chair 1 did not diminish its worth or utility.

29.

{¶ 68} The worth or utility of Chair 1 must be evaluated in light of the scope of its use. Chair 1 was not the only lifeguard station at the quarry. Rather, Chair 1 was part of a network of lifeguard chairs and lifeguard stations that blanketed the swimming area at the quarry. This network included five chairs, several of which had lines of sight at the diving platform, including Chair 1 & 1/2, which was positioned on the diving platform immediately adjacent to the location from which divers jump into the water.

{¶ 69} Appellees contend that Chair 1 was defective because it did not provide an adequate vantage point to enable lifeguards to observe P.S. in distress. However, this contention ignores the fact that there were many other stations available to the lifeguards that would indisputably offer this vantage point and that Chair 1 & 1/2 was properly positioned to cover divers, such as P.S., as they dive from the platform. The problem, therefore, lies in the *staffing* of the lifeguard stations, not the design and placement of the lifeguard stations. Viewing appellees' evidence in light of the quarry facility as a whole, we do not find that it creates a genuine issue of material fact as to whether Chair 1 was physically defective.

{¶ 70} Moreover, we find that the evidence does not support the notion that P.S.'s drowning was due to the placement and design of Chair 1. Having carefully reviewed Galambos's affidavit, which was the only evidence produced by appellees to establish the applicability of the physical defect exception, it is clear that even Galambos viewed the *staffing* of the lifeguard chairs that were available to on-duty lifeguards at the time of the

30.

drowning, and not the *placement* of any individual chair or its physical characteristics, as the determinative factor in the drowning.

{¶ 71} By his own admission, Galambos acknowledged that the lifeguards who were on duty had the discretion to occupy other stations with a better vantage point from which to monitor those swimmers who were diving from the high-dive platform. Specifically, Galambos opined that staffing a lifeguard in Chair 1 & 1/2 would have provided an appropriate vantage point for a lifeguard to observe a swimmer in distress after jumping from the platform. Therefore, to the extent that Chair 1's placement at the quarry facility could be construed as somehow defective (which we have found that it is not), we find that appellees' own evidence undercuts the notion that such a defect the cause of P.S.'s drowning, for it was the lack of a lifeguard in Chair 1 & 1/2, not the line of sight between Chair 1 and the high-dive platform, that Galambos considered the cause of the drowning.

{¶ 72} To avoid summary judgment in this case, appellees had the burden of creating a genuine issue of material fact as to the applicability of the physical defect exception under R.C. 2744.02(B)(4). To do so, they needed to introduce evidence to demonstrate that P.S.'s death was caused by employee negligence on the quarry grounds, and that the drowning was due to physical defects on or within those grounds.

{¶ 73} Galambos's affidavit created a genuine issue of material fact as to whether the drowning was caused by employee negligence. However, employee negligence alone

31.

is insufficient to trigger the physical defect exception to the general grant of immunity afforded SAJRD under R.C. 2744.02(A)(1). "R.C. 2744.02(B)(4) requires the injuries at issue to be caused *both* by a political-subdivision employee's negligence *and* a physical defect on the grounds." (Emphasis sic.) *Parmertor*, *supra*, 2016-Ohio-761, 47 N.E.3d 942, at ¶ 16. Appellees did not demonstrate that P.S.'s death was due to a physical defect on the quarry grounds. They failed to meet their burden on this issue in two respects: (1) they failed to show the existence of a physical defect in the first instance; and (2) they failed to show how a physical defect, and not a staffing decision, led to the drowning.

{¶ 74} Since there is no evidence in the record to demonstrate that P.S.'s death was due to a physical defect on the quarry grounds, the physical defect exception under R.C. 2744.02(B)(4) is inapplicable in this case. Therefore, SAJRD is entitled to political subdivision immunity as a matter of law, and its motion for summary judgment should have been granted.

{¶ 75} Accordingly, SAJRD's first, second, and sixth assignments of error are well-taken. Because we have found, as a matter of law, that SAJRD is entitled to immunity under the first tier of our analysis and appellees did not establish an exception to such immunity under the second tier of our analysis, there is no need to consider whether immunity should be reinstated under the third tier of the analysis. Therefore, we need not address SAJRD's third and fourth assignments of error, in which SAJRD argues that the discretionary defense to reinstate immunity under in R.C. 2744.03(A)(5) is

32.

applicable. Moreover, our conclusion that summary judgment should have been granted to SAJRD based upon its immunity from suit renders moot SAJRD's fifth assignment of error challenging that portion of the trial court's decision in which the trial court permitted appellees to amend their third-party complaint. Consequently, we do not address the fifth assignment of error.

### III. Conclusion

{¶ 76} In light of the foregoing, the judgment of the Lucas County Court of Common Pleas is reversed, and this matter is remanded to the trial court with instructions for the trial court to enter judgment in favor of SAJRD consistent with this decision. The costs of this appeal are assessed to appellees under App.R. 24.

Judgment reversed
and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.          _____
                                         JUDGE
Gene A. Zmuda, J.          

Myron C. Duhart, P.J.          _____
CONCUR.                                          JUDGE

_____
                                         JUDGE

33.

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.